## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARRY PLOST, an individual; and RENA PLOST, an individual,<br><br>    Plaintiffs,<br><br>  v.<br><br>LUXURY VACATION HOME LLC, a Delaware limited liability company; HUGH BARTON, an individual; and SHAWN BENESH, an individual,<br><br>    Defendants. | **NO.**<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

  Plaintiffs BARRY PLOST and RENA PLOST ("Plaintiffs," the "Plosts," or "Mr. and Mrs. Plost"), by and through their attorneys, Riker Danzig Scherer Hyland & Perretti, LLP, by way of this Complaint against Defendants LUXURY VACATION HOME LLC ("LVH"), HUGH BARTON ("Barton"), and SHAWN BENESH ("Benesh") (LVH, Barton and Benesh are collectively referred to herein as "Defendants"), hereby allege as follows:

### NATURE OF THE ACTION

  LVH is a luxury vacation home rental company that holds itself out as offering "five star full service luxury vacation homes" and "the highest standard of excellence in luxury full service home rentals," with "carefully curated" homes promised to "exceed [] expectations," "unrivalled amenities" and "unparalleled service." Based on these representations, Plaintiffs turned to LVH for assistance finding a luxury home to rent for a two-week vacation in Malibu, California. LVH sent Plaintiffs a link to its website containing photographs for a property referred to as Villa Winona ("Villa Winona" or the "Property"). The photographs represented Villa Winona as being a high-end, gorgeous, well-appointed, and well-maintained home. LVH also informed Plaintiff that rental of the home would include a personal butler, daily maid service, a "concierge to organize [the] perfect itinerary," "welcome champagne, hors d'oeuvres and flowers," as well as "luxury linens, spa products, and more" and that, due to COVID-19, all homes would be pre-inspected and sanitized

prior to arrival.  Based on these representations and the beautiful photographs of the Property Plaintiffs received, Mr. Plost entered into the Booking Services Agreement with LVH (the "Booking Agreement") and wired LVH $164,400.00.

The Property was far from the high-end luxury rental LVH had promised.  Upon Plaintiffs' arrival at the Property, the trash was overflowing, many of the lights in the home were not working, numerous pieces of furniture, cabinets, fixtures and equipment throughout the house were dirty, damaged, rusted, of poor quality and/or not working, the air conditioning was inadequate, and the steps leading to the beach were shoddy and unsafe, among many other issues.

Plaintiffs immediately notified LVH and the "property manager" LVH identified, Ronald Davidson, of the problems and documented such items before leaving the Property.

In response, both Mr. Davidson and LVH represented that Mr. Plost would receive a full refund of his $164,400.00.  Yet approximately four months after having left the property, Mr. Plost has not received a refund in any amount.

Further, although LVH represented it was the "agent to the owner and/or the property management company of the Property," Plaintiffs have since learned that neither the owners nor their property manager had a relationship with LVH and that the owners only first heard of LVH after they were contacted by Plaintiffs' counsel.

Apparently, in a rush to place Plaintiffs in a property while the market was tight due to the COVID-19 pandemic, Defendants did not conduct proper diligence of the Property to confirm it met their representations and the pictures they provided, and Defendants never entered into a relationship with the owners, choosing instead to allow the Property to be rented and re-rented via multiple middlemen.  Defendants then took advantage of Plaintiffs by making misrepresentations about the Property and their relationship to the owners and charged Plaintiffs an exorbitant amount to rent the Property that clearly did not meet the "luxury" standard Defendants represented.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2.      Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to each claim occurred in the Southern District of New York. The Booking Agreement was negotiated and executed through conversations and correspondence with LVH, Mr. Barton, and Mr. Benesh at or through LVH's New York office, and the Booking Agreement specifies that it is governed by New York law and that all disputes must be referred to a New York court.

3.      This Court has personal jurisdiction over LVH because LVH's principal place of business is in New York, New York.

4.      This Court has personal jurisdiction over Mr. Barton because, as LVH's Chief Operating Officer, he conducts business at LVH's New York office. Further, on information and belief, Mr. Barton is a resident of New York.

5.      This Court has personal jurisdiction over Mr. Benesh because, as LVH's Business Development and Client Relations Officer, he conducts business at LVH's New York Office. Further, on information and belief, Mr. Benesh is a resident of New York.

## PARTIES

6.      Plaintiff Barry Plost is an individual residing and regularly doing business in the state of California. For purposes of diversity jurisdiction, Mr. Plost is a citizen of the state of California.

7.      Plaintiff Rena Plost is an individual residing in the state of California. For purposes of diversity jurisdiction, Mrs. Plost is a citizen of the state of California.

8.      Defendant LVH is a Delaware limited liability company with a principal place of business in New York, New York.  For purposes of diversity jurisdiction, LVH is a citizen of Delaware and New York.

9.      Defendant Hugh Barton is an individual.  For purposes of diversity jurisdiction, on information and belief, Mr. Barton is a citizen of the state of New York.

10.     Defendant Shawn Benesh is an individual.  For purposes of diversity jurisdiction, on information and belief, Mr. Benesh is a citizen of the state of New York.

## BACKGROUND

11.     LVH is a vacation rental company that purports to "hold[] the highest standard of excellence in luxury full service home rentals" "[w]ith over thousands of 5-star luxury homes in over 90 destinations worldwide" which are "carefully curated to exceed [] expectations with unrivalled amenities and [ ] unparalleled service."  (https://lvhglobal.com/)

12.     Based on LVH's representations of providing the highest standards of excellence and unparalleled service, in or around July 2020, Mr. Plost and his wife, Rena, began communicating with Messrs. Barton and Benesh of LVH regarding renting a luxury vacation home in California for a two-week vacation.  Since they were unable to truly get away as they normally would and had been staying at their home in Los Angeles due to the COVID-19 pandemic for months, they were looking to enjoy a "stay-cation" in nearby Malibu, California.  During their discussions with Messrs. Barton and Benesh, the Plosts made clear that they were looking for a high-end luxury home with a nice outdoor living space, as they turned down other homes LVH presented that did not meet those requirements.

13.     On or about July 31, 2020, Mr. Benesh, copying Mr. Barton, sent the Plosts a link to LVH's website containing photographs of Villa Winona, a house located at 27112 Malibu Cove Colony Drive, Malibu, California, 90265.  Those photographs represented Villa Winona as being a

4

high-end, gorgeous, well-appointed, and well-maintained home.  A representative sample of some of the photographs provided to the Plosts by LVH via that link are attached hereto as **Exhibit 1**. Mr. Benesh informed Mr. Plost that rental of the home would also include a personal butler, maid service every day, a "concierge to organize perfect itinerary," "welcome champagne, hors d'oeuvres and flowers," as well as "luxury linens, spa products, and more."  Further, LVH represented that due to the COVID-19 pandemic, LVH was taking extra preventative measures, including by pre-inspecting and pre-sanitizing homes prior to guest arrival.

14.     Based on these photos and representations, including that LVH proudly touts itself as a purveyor of "five star full service luxury vacation homes" that "holds the highest standard of excellence," Plaintiffs agreed to rent the Property.

15.     On or about July 31, 2020, Mr. Plost signed the Booking Agreement with LVH for the two-week rental of Villa Winona, beginning on September 1, 2020 and ending on September 15, 2020.  He also wired LVH $164,400.00 for the rental.

16.     Unfortunately, Villa Winona did not "exceed [the Plosts'] expectations" as LVH promised it would or live up to the descriptors of "five star," "luxury" or "excellence."  Instead, the Plosts found the Property to be in a worn and abysmal state.

17.     Many of the problems with the Property became apparent on the evening the Plosts arrived.  It was immediately clear that the Property had not been pre-inspected, cleaned, and sanitized prior to their arrival as promised by LVH, as they noticed the trash was full and had not been taken out for trash pickup.  Pursuant to the terms of the Booking Agreement, Mr. Plost immediately contacted LVH to address the issue, and LVH sent over Ronald Davidson at 10:30 p.m. that night.  Mr. Davidson introduced himself as the "property manager," which the Plosts recently learned was untrue.  Mr. Davidson represented he had a relationship with the Property owners but had not been to the Property in a while and was shocked and embarrassed by its state.  He made

multiple remarks supporting the abysmal state of the Property that night and over the next couple of days, including calling it "terrible" and questioning, "How could they [the owners] do this to you?"

18.     The Plosts found numerous other issues with the Property over the course of the next couple of days, including but not limited to:  (1) many of the lights in the house were not working, including lights for which special bulbs needed to be ordered; (2) furniture, cabinets, fixtures and equipment throughout the house were damaged, rusted, of poor quality and/or not working; (3) there was a black substance under the kitchen sink that appeared to be mold; (4) the steps leading from the house to the beach were shoddy and unsafe; (5) a cold-water faucet handle in one of the bathrooms fell off into Mrs. Plost's hand; (6) the bar electrical system was not working, resulting in a non-functioning dishwasher; (7) the master closet lighting track system was not working; (8) front door handles were falling off; (9) entry door handles were not only falling off, but were also filthy; (10) lounges were missing from the outdoor patio area; (11) the TV programming was limited; and (12) the air-cooling systems were inadequate (at a time when temperatures in Malibu were expected to rise to over a 100 degrees).

19.     Again, consistent with the terms of the Booking Agreement, Mrs. Plost contacted LVH and described many of these issues in a September 2, 2020 email.  Despite being promised "the highest standard of excellence" and "unparalleled service," Mrs. Plost reported that she had spent an entire day dealing with the many issues at the Property rather than being on holiday as she should have been.

20.     The concierge provided by LVH arranged a handyman who attempted to fix some of the problems, but he was unable to fix many of them.  Indeed, things got even worse early the next morning, when the Plosts were awakened at 4:00 a.m. by the incessant chirping sound of a smoke alarm, indicating that the device's battery life was coming to an end.

21.     As it was clear that Villa Winona had not been maintained properly, was not in the condition represented by LVH, and was, frankly, unsafe and uninhabitable, Mr. Plost notified LVH on the morning of September 3, 2020, in writing via email, that he and his wife would be vacating the premises the next day.

22.     Prior to vacating the Property, Mr. Plost documented the condition of the Property by taking photographs and video.  A representative sample of some of the photographs is attached hereto as **Exhibit 2**.  Such pictures show some of the issues noted above and others, including: (1) the steps leading down to the beach were narrow and the wooden railings on each side of the steps were rickety, looking like they were repaired poorly and hastily at different times, with some of the wood being painted, some left raw and some decaying away; (2) portions of the paint/stucco on the exterior of the Property was bubbling, chipped and rusted, and there was a large section of wall/stucco that seemingly was removed for repair (revealing the studs) but had not been repaired; (3) much of the metal work on the outside of the house, including metal wire that made up part of the protective railing of the patio, was rusted; (4) much of the metal inside the house was also rusted, including, for example, floor vents, electrical outlets and metal portions of furniture; (5) the air conditioning units were temporary, inadequate, and an eye sore; (6) the outdoor barbeque was dirty and extremely rusted; (7) some of the outdoor paving stones and many of the outdoor cushions were stained; (8) the kitchen/bar fixtures, including, for example, the refrigerator, which was marked with long water stains, appeared to not have been recently cleaned; (9) the cabinets were dirty and scuffed, with paint chipping in some places, and they appeared to have not been recently cleaned; (10) paint on the walls inside the house was scuffed and dirty; and (11) flower pots were filled with dead plants.

23.     Prior to vacating the Property, and at LVH's request, Mr. Plost allowed Mr. Davidson and the LVH concierge to document the issues as well on the afternoon of September 3, 2020.

24.     At no time prior to the Plosts' departure did anyone at LVH tell Mr. Plost that he and his wife should not leave or that he would not receive a full refund if they vacated the Property.

25.     Indeed, LVH agreed that Mr. Plost was entitled to receive "a 100% refund," as evidenced by numerous emails and texts in which LVH and/or its agents repeatedly assured Mr. Plost that a full refund was forthcoming.  Specifically, LVH's agent, Mr. Davidson, informed Mr. Plost on multiple occasions both orally and in writing that he would receive a full refund, and Mr. Barton and Mr.  Benesh confirmed and ratified that promise both orally and in writing.  For example, in a September 16, 2020 email from Mr. Benesh to Mr. Plost, he stated in part, "[W]e are issuing a full refund for the last booking."

26.     For months, Mr. Plost was promised a full refund and was given excuses by LVH and its agents as to why the refund had not been provided.  Unfortunately, months later, Mr. Plost still has not received any of his money back, including the security deposit, service fees, taxes, etc.

27.     During Plaintiffs' attempts to recover the full refund promised, they learned of numerous additional misrepresentations made by LVH and/or its agents.

28.     In the Booking Agreement, LVH identified itself as "the agent to the owner and/or the property management company of the Property (the 'Owner')."  However, Plaintiffs later learned that both of these representations were false and that the actual Property owners had never heard of LVH until they received a letter from Plaintiffs' counsel regarding the requested refund. Plaintiffs also learned that Ronald Davidson, an agent of LVH, was not the property manager and, despite Mr. Davidson's representations, he had no relationship with owners of the Property. Plaintiffs are informed and believe, and thereon allege, that on or about August 2, 2020, the Property

owners actually rented the Property for the period in question to Stay LA Luxury Rentals, which has no relationship with LVH.

29.     Plaintiffs have also learned that the Property typically rents for approximately $20,000.00 per week, not the $60,000.00 plus per week charged by LVH.

30.     Based on the foregoing, Plaintiffs are informed and believe, and thereon allege, that LVH, without the knowledge or consent of the Property owners, rented the Property to Plaintiffs at a rate that far exceeds its market value, at a significant profit to LVH.

31.     In short, likely because the rental market was tight due to COVID-19 and they were having difficulty finding an available luxury rental in their portfolio for Plaintiffs to rent, Defendants performed inadequate diligence on the Property and allowed for multiple layers of middlemen between themselves and the Property owners, for whom they were meant to have a direct relationship but did not.  They then knowingly capitalized on Plaintiffs wanting to get away from the stress of COVID-19 by overcharging them for what was clearly not a "luxury" property.

## FIRST CLAIM
### Fraud in the Inducement
### (Against All Defendants)

32.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

33.     Defendants made numerous false misrepresentations of material fact to Plaintiffs to induce Mr. Plost into entering into the Booking Agreement, including but not limited to the following:

   a.   Defendants represented that the Property was a high-end luxury home that would exceed Plaintiffs' expectations and be worth the high price tag to rent it. Defendants provided pictures that did not depict the current state of disrepair of the Property.

9

b.  Defendants represented that they would pre-inspect and sanitize the Property.

c.  Defendant LVH represented in the Booking Agreement that it was "an agent to the owner and/or the property management company of the Property."

34.  Defendants knew at the time each of these representations were made that they were untrue.

35.  These representations were made with the intent to induce Mr. Plost to enter into the Booking Agreement and to rent the Property at a price that far exceeded its market to value.

36.  Mr. Plost justifiably relied on these representations as an inducement to enter into the Booking Agreement and to wire LVH $164,400.00.  Had Mr. Plost known of Defendants' false representations, he would not have entered into the Booking Agreement and wired the funds to rent the Property, and Plaintiffs would not have expended their valuable time and energy traveling to/from the Property and trying to address the issues there with Defendants.

37.  As a direct and proximate result of the foregoing, Plaintiffs have been damaged in an amount to be proven at trial, including $164,400.00, plus interest, and other out-of-pocket damages.

38.  The acts of Defendants were willful, malicious, wanton, reckless, fraudulent and oppressive, with the intent to harm and damage Plaintiffs, entitling Plaintiffs to an award of punitive and exemplary damages to be determined by the trier of fact.

**SECOND CLAIM**
**Constructive Fraud**
**(Against All Defendants)**

39.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

40.  By virtue of the Booking Agreement, and their role as booking agents for Mr. Plost, Defendants owed Mr. Plost a duty of care and loyalty.  They further owed Mr. Plost an utmost

fiduciary duty of honesty and were required by that duty to disclose all material facts with respect to his rental of the Property.

41.    Defendants committed constructive fraud when they secretly rented the Property to Mr. Plost as "an agent to the owner and/or the property management company of the Property," when they were not in fact the agents of the owners and had never spoken with the owners or the owners' property managers.

42.    Defendants also committed constructive fraud by renting the Property to Mr. Plost without personally inspecting it and by renting the Property to him at a rate that was more than three times its market value.

43.    Defendants acted with an intent to deceive and mislead Mr. Plost for significant profit to Defendants.

44.    As a direct and proximate result of the foregoing, Plaintiffs have been damaged in an amount to be proven at trial, including $164,400.00, plus interest, and other out-of-pocket damages.

45.    The acts of Defendants were willful, malicious, wanton, reckless, fraudulent and oppressive, with the intent to harm and damage Plaintiffs, entitling Plaintiffs to an award of punitive and exemplary damages to be determined by the trier of fact.

### THIRD CLAIM
**Fraud**
**(Against All Defendants)**

46.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

47.    Defendants made numerous misrepresentations of material fact to Plaintiffs, including, but not limited to, the following:

a. Defendants represented that the Property was a high-end luxury home that would exceed Plaintiffs' expectations and be worth the high price tag to rent it. Defendants provided pictures that did not depict the current state of disrepair of the Property.

b. Defendants represented that they would pre-inspect and sanitize the Property.

c. Defendant LVH represented in the Booking Agreement that it was "an agent to the owner and/or the property management company of the Property."

d. Defendants represented to Plaintiffs that Mr. Davidson was the Property manager, and LVH's agent, Mr. Davidson, also represented that he was the Property manager.

e. Defendants represented that Mr. Plost would receive a full refund, both directly and through their agents.

48. Defendants knew at the time each of these representations were made that they were untrue.

49. These representations were made with the intent to deceive and the purpose of inducing Mr. Plost to rent the Property at a price that far exceeded its market to value.

50. Plaintiffs justifiably relied on these representations.  Had Mr. Plost known of Defendants' false representations, he would not have entered into the Booking Agreement and wired the funds to rent the Property, and Plaintiffs would not have expended their valuable time and energy traveling to/from the Property and trying to address the issues there with Defendants.

51. As a direct and proximate result of the foregoing, Plaintiffs have been damaged in an amount to be proven at trial, including $164,400.00, plus interest, and other out-of-pocket damages.

52. The acts of Defendants were willful, malicious, wanton, reckless, fraudulent and

oppressive, with the intent to harm and damage Plaintiffs, entitling Plaintiffs to an award of punitive and exemplary damages to be determined by the trier of fact.

## FOURTH CLAIM
### Negligent Misrepresentation
### (Against All Defendants)

53.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

54.     Defendants made numerous misrepresentations of material fact to Plaintiffs, including, but not limited to, the following:

a.  Defendants represented that the Property was a high-end luxury home that would exceed Plaintiffs' expectations and be worth the high price tag to rent it. Defendants provided pictures that did not depict the current state of disrepair of the Property.

b.  Defendants represented that they would pre-inspect and sanitize the Property.

c.  Defendant LVH represented in the Booking Agreement that it was "an agent to the owner and/or the property management company of the Property."

d.  Defendants represented to Plaintiffs that Mr. Davidson was the Property manager, and LVH's agent, Mr. Davidson, also represented that he was the Property manager.

e.  Defendants represented that Mr. Plost would receive a full refund, both directly and through their agents.

55.     Defendants should have known at the time each of these representations were made that they were untrue.

56.     These representations were made with the purpose of inducing Mr. Plost to rent the Property at a price that far exceeded its market to value.

57.     Mr. Plost justifiably relied on these representations.  Had Mr. Plost known of Defendants' false representations, he would not have entered into the Booking Agreement and wired the funds to rent the Property, and Plaintiffs would not have expended their valuable time and energy traveling to/from the Property and trying to address the issues there with Defendants.

58.     As a direct and proximate result of the foregoing, Plaintiffs have been damaged in an amount to be proven at trial, including $164,400.00, plus interest, and other out-of-pocket damages.

**FIFTH CLAIM**
**Breach of Contract**
**(Against Defendant LVH)**

59.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

60.     On or about July 31, 2020, Mr. Plost and LVH executed the Booking Agreement.

61.     Under the terms of the Booking Agreement, LVH agreed that it would "reasonably endeavor" to fix problems at the Property if Plaintiffs notified LVH of such problems before vacating the Property.

62.     Mr. Plost fulfilled his obligations under the Booking Agreement, including by wiring the required funds and by promptly notifying LVH and its agents of issues with the Property, including via communications from Mrs. Plost.

63.     In contrast, LVH has not fulfilled its obligations under the Booking Agreement, as it failed to provide a luxury rental and to remedy the numerous issues with Property.

64.     Under the terms of the Booking Agreement, LVH also stated it was "an agent to the owner and/or the property management company of the Property."  That was not true and was also a breach of the Booking Agreement.

65.     As a direct and proximate result of Defendant LVH's breaches, Mr. Plost has been damaged and has suffered losses in an amount exceeding $164,400.00, plus interest.

## SIXTH CLAIM
### Breach of the Covenant of Good Faith and Fair Dealing
### (Against Defendant LVH)

66.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

67.     On or about July 31, 2020, Mr. Plost and LVH executed the Booking Agreement.

68.     The Booking Agreement included an implied covenant of good faith and fair dealing, requiring LVH to act in good faith and to conduct fair dealing.

69.     Mr. Plost fulfilled his obligations under the Booking Agreement, including by wiring the required funds and by promptly notifying LVH and its agents of issues with the Property, including via communications from Mrs. Plost.

70.     LVH breached its duty of good faith and fair dealing by failing to provide a curated luxury rental, failing to enter into the appropriate agency relationship with the owner and/or Property manager, failing to pre-inspect/clean the Property, failing to remedy the numerous issues at the Property, and failing to tell Mr. Plost at any point that he might not receive a full refund if he vacated the Property.

71.     As a direct and proximate result of Defendant LVH's breaches, Mr. Plost has been damaged and has suffered losses in an amount exceeding $164,400.00, plus interest.

## SEVENTH CLAIM
### Unjust Enrichment
### (Against All Defendants)

72.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

73.     With the expectation that he would be renting a luxury home that fit Defendants' representations, Mr. Plost wired LVH $164,400.00.

74.     Defendants have been unjustly enriched by the receipt of such funds having not provided the services and luxury home they promised.  They did not, for example:  conduct proper due diligence on the Property to ensure it was the curated luxury property they promised; enter into the appropriate agency relationship with the owner and/or Property manager, of the Property; deliver a luxury property; pre-inspect/clean the Property; and remedy the numerous issues at the Property once informed of those issues by Plaintiffs.

75.     Defendants also promised on multiple occasions, including through their agents, that Plaintiffs would receive a full refund, and yet they have not returned any portion of the funds.

76.     Defendants have unjustly retained the benefit of the wired funds to Mr. Plost's detriment, and Defendants' retention of such benefit violates fundamental principles of justice, equity, and good conscience.

77.     Under principles of equity and good conscious, Defendants should not be permitted to keep any of the $164,400.00, and such entire amount should be returned to Mr. Plost.

### EIGHTH CLAIM
**Money Had and Received**
**(Against All Defendants)**

78.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

79.     With the expectation that he would be renting a luxury home that fit Defendants' representations, Mr. Plost wired LVH $164,400.00.

80.     Defendants have benefitted from the receipt of such funds without having provided the services and luxury home they promised.  They did not, for example:  conduct proper due diligence on the Property to ensure it was the curated luxury property they promised; enter into the

appropriate agency relationship with the owner and/or Property manager, of the Property; deliver a luxury property; pre-inspect/clean the Property; and remedy the numerous issues at the Property once informed of those issues by Plaintiffs.

81.     Defendants also promised on multiple occasions, including through their agents, that Plaintiffs would receive a full refund, and yet they have not returned any portion of the funds.

82.     Under principles of equity and good conscious, Defendants should not be permitted to keep any of the $164,400.00, and such entire amount should be returned to Mr. Plost.

**NINTH CLAIM**
**Replevin**
**(Against All Defendants)**

83.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

84.     With the expectation that he would be renting a luxury home that fit Defendants' description, Mr. Plost wired LVH $164,400.00, which was meant to cover, in part, per the Booking Agreement, service fees in the amount of $15,000.00, taxes in the amount of $14,400.00, and a security deposit of $15,000.00.

85.     Mr. Plost has a superior right to all of these funds since Plaintiffs were only at the Property for a short time due to Defendants' wrongdoing noted herein, and therefore, Plaintiffs did not utilize the Property or services as originally intended.  Further, Plaintiffs did not inflict any damage on the Property that would justify the retention of any portion of the $15,000.00 security deposit.

86.     As such, Mr. Plost is entitled to the immediate return of his $164,400.00.

/ / /

/ / /

/ / /

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.      Enter judgment in favor of Plaintiffs, Barry Plost and Rena Plost, and against Defendants, Luxury Vacation Home LLC, Hugh Barton, and Shawn Benesh, and award damages in excess of $164,400.00 or such sums as are proven at trial;

B.      Rescind the Booking Agreement;

C.      Award punitive and exemplary damages as determined by the trier of fact;

D.      Award statutory interest at the rate of five percent (5%) per annum;

E.      Award costs of this action as allowed by law; and

F.      Grant such further and other relief as this Court deems just and equitable.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated:   January 4, 2021

RIKER DANZIG SCHERER HYLAND & PERRETTI LLP

By:  _____

Richard J.L. Lomuscio
(rlomuscio@riker.com)
Stephanie R. Wolfe
(swolfe@riker.com)

500 Fifth Avenue, 49th Floor
New York, New York 10110
Telephone:  (212) 302-8255
Facsimile:  (973) 451-3860

*Attorneys for Plaintiffs Barry and Rena Plost*